In the UNITED STATES DISTRICT COURT
for the NORTHERN DISTRICT of TEXAS
Fort Worth Division

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL 1 2 2021

CLERK, U.S. DISTRICT COURT
By: _____
Deputy

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff – Respondent , | ) | |
| | ) | |
| vs. | ) | Case 4:00-CR-00054-Y |
| | ) | Judge Terry R. Means |
| THOMAS REEDY, | ) | |
| Defendant – Movant. | ) | |

**DEFENDANT'S REPLY**
[To Government's Response, Doc. # 368]

## WHY A REPLY?

A Reply is necessary because Respondent had one job to do, but frankly, did not do it: The ORDER said, "Specifically, the Court wishes the government's response to address the factors and concerns set out in *[United States] v. Tolliver*, Crim. No. 4:00-CR-84-Y, 2021 WL 1419456 (N.D. Tex. Mar. 29, 2021)." (ORDER FOR GOVERNMENT RESPONSE, Doc. No. 367). As a matter of fact, the government avoids mentioning *Tolliver*, choosing instead to rely on inapposite cases. Even when a certain "factor or concern" (which happens to appear in *Tolliver*) crops up, Respondent's analysis is distorted.

1

Under *Tolliver*, compassionate release may be granted based on the length of Reedy's sentence, so long as he shows the following "extraordinary and compelling reasons":

> **(1)** an "exceptionally dramatic change" in the relevant sentencing regime; **(2)** that, today, the defendant would receive a significantly reduced sentence; **(3)** the defendant appears rehabilitated, deserving of the reduction, and likely to succeed upon release; and **(4)** strong deference to the BOP's relevant guidelines and decisions.  The Court articulates this test for **consistency**.  Like cases should be decided the same or else the decisions will appear arbitrary.  This is especially true when cases appear before the same judge.  Without explaining its rulings, the Court risks the appearance of inconsistency, which tends to reduce trust in the judiciary and the rule of law."  (Emphasis added.)

*Tolliver*, 201 U.S. Dist. LEXIS at 11-12.

*Tolliver* presciently predicted the Fifth Circuit's decision in *United States v. Shkambi*, 2021 U.S. App. LEXIS 10053 (5th Cir. Apr. 7, 2021).  This echoed the Tenth Circuit case of *United States v. McGee*, ___ F.3d ___ (10th Cir. 2021) (relief granted for "unique circumstances that, in combination[d] with the mandatory sentence he received consitute[d] 'extraordinary and compelling reasons' for a compassionate release;" and was based on an individualized review of all the circumstances of defendant's specific case.)  As an aside, like Reedy at bar, *McGee* was *not* a § 924(c) case, but rather was a mandatory sentence for his § 841 conviction.

Therefore, Defendant implores the Court's indulgence in explaining anything that may have been unclear in his motion for compassionate release (Doc. No. 363).  Such

things do happen, and a Reply will help.  As for the government's unexplained refusal to do what it was asked to do, Thomas Reedy provides the following:

I.  There is no basis for contending that Reedy's § 3582 motion should be treated like a habeas petition.

II.  Even leaving to one side the intolerable doubt surrounding the financial loss, Respondent's efforts to evade the mandatory stacked-to-life sentence are unhelpful and confusing (*See*, Response: Doc. No. 368, comparing Reedy's mandatory stacked-to-Life, first-time offender sentence, to *discretionary* guidelines cases involving defendants with long criminal histories).

III.  Granting Thomas Reedy's motion for compassionate release requires that:  **(a)** he either exhausted his petition or 30 days have elapsed since he submitted his request to the Warden, whichever comes first; **(b)** he has established an extraordinary or compelling reason for release; **(c)** his release will not pose a danger to the community; and **(d)** his release is consistent with the Section 3553(a) factors.

## CLARIFICATIONS

There are just a few things that need to be dusted off before delving into those three issues.  Respondent's version of the procedural background left some things wanting and others unclear.  A clearing-up of factual and a procedural matters are as follows:

**Factual Clarification**

1.  Respondent said that webmasters "relied on Landslide's KeyZ service to manage and maintain their pornography sites."  Yet, Landslide's role is described differently by the Fifth Circuit:

    "Websites specializing in child pornography paid the Reedys a portion of their profits to establish a sign-on, screening, and age verification system for subscribers." *United States v. Reedy*, 304 F.3d 358, 361 (5th Cir. 2002).  A dozen or so webmasters insidiously ill-used Landslide gradually over time, which caused the Reedy's to eventually become criminally culpable (out of about 5,000 sites, just ten websites were evidenced as containing illegal content, that is, child pornography).  The second appeal recognized as much, saying "The Reedys owned and operated a company that provided computerized credit card verification services to webmasters whose websites contained adult and child pornography."  *United States v. Reedy*, 145 Fed.Appx. at 466 (5th Cir. 2005).

    For Respondent to say Reedy "managed and maintained" child pornography websites is stretching the truth.  Reedy does not deny he had a role to play and has repented of his crimes.  It would have been more accurate to say Thomas and Janice Reedy ran a company that profited as a middle-man between users and webmasters.

2.  Respondent relies on PSR summaries – instead of the trial record – to describe how Landslide "responded to complaints from customers, some of whom were dissatisfied

with the quality of the child pornography content.  In response, Reedy's wife, Janice, would contact webmasters to advise them that they needed to 'improve' the quality of their content."  (RESPONSE, Doc. No. 368 at PageID#1262).

Respondent mischaracterizes the facts dramatically.  The emails refer to *Janice* Reedy's portion of the trial, not Thomas'.  *See*, Trial transcript Volume III at 469 and following (RITCHESON – DIRECT):  Janice informed the webmaster that their site was pulled for having *no content at all.*  Trial testimony showed that 99.5% of the sites were legal, and *that* particular customer's credit cards were charged-back (refunded). Further, customers were given instructions to report illegal content to the authorities (TT at 477-79).

Officially, the Reedy's began their company at the same time that the Communications Decency Act of 1996 was adopted into law.  The Government admits that the Reedy's did not make much money prior to starting Landslide ($40,000 annually, Doc. 368 at PageID#1272), and tacitly concedes that for all his creative qualities, Thomas Reedy at the time had no real business management training. *Id.* For example, what business plan includes child pornography in a legal adult verification system?  Until it was (mostly) repealed, the Communications Decency Act exempted Landslide from third-party liability.  As a trivial matter, this "exemption" is still making news today as debates rage over "Section 230" and big Tech's choice to engage in massive media censorship.

3. The Court may benefit from a stabilized summary of the financial loss question.

    a.  The Government agrees with the law of the case that Reedy explained in his 2nd § 2255. The context is that Landslide's gross sales from Sep. 1997 through Aug. 1999 were $9,275.964; and that $204,025 was returned to dissatisfied customers. Landslide incurred pre-profit costs of $6,103,517 (charge-backs to customer's credit cards). Based on this information, the auditor (Rex Rector for both trial and the indictment) determined that Landslide had made a profit of $2,968,422; and from that amount, $1,290,412 of the proceeds came from the ten illegal websites named in the indictment. *Reedy*, 304 F.3d at 362.

        At the first sentencing, a new auditor surprised the first, saying that $5,792,475.15 represented the total amount of pecuniary gain from all the child pornography websites for which Landslide operated its credit card verification system. *Id*. At 370. But that was also the *entire* KeyZ.com sales proceeds (proceeds that trial records show included legal adult sites). This was a head-scratcher, because what the appellate court did not parse out in its ruling, nor did the new sentencing auditor explain in detail, was *what happened to the pre-profit "incurred costs" of $6.1M*? In other words, in order for the second auditor to arrive at $5.7M pecuniary gain, the charge-backs to customers from the first auditor would have had to disappear.

        At bar, Reedy does not challenge the appellate court finding, rather, he perceived an *internal inconsistency* in the order which gave rise to an honest question and context.

    b.  By 2011, *two* forensic computer "experts" from England provided evidence saying that the financial servers used by the sentencing auditor held (likely) corrupted data. But they did not analyze the *original* server from trial, they had a defense copy. In other words, it would take nearly a decade after Reedy's

6

first appeal to "re-argue" (as Respondent puts it, Doc. No. 368 at PageID#1264-1266), and try asking about the unaccounted costs of charge-backs, fraud, etc. It took those two things together (the $6.1M in charge-back confusion, _plus_ the corrupted server data), for the Fifth Circuit to only _then_ authorize a 2nd 2255.

c.  Contrary to Respondent's insinuation, Mr. Reedy does not contest that this Court found the evidence did not "clearly and convincingly" warrant relief of a constitutional magnitude (a 2nd § 2255 is a very high bar). _Reedy v. United States_, 4:12-cv-271, Doc. Nos. 20-21. Government destruction of evidence only served to aggravate nagging doubt, and Reedy accepts that it may never resolve itself[1].

Reedy is not re-litigating that bad fact, he simply described it in his § 3582 motion as worthy of consideration in the "totality of circumstances." And only _after_ his mandatory stacked-to-Life sentence is analyzed under the § 3582 standards. Based on the record statements from the Court, the probability is arguably high enough that if he were sentenced today, it would not be to die in prison. _Shkambi/McGee._

**Procedural Clarifications**

In a similar manner to Respondent's factual misrepresentations are exaggerated distortions from the court's procedural record:

---

[1] Before a computer expert could re-analyze the financial servers, the Government at bar threw away the evidence it was asked to preserve; citations in Motion for Sentence Reduction, Doc. No. 363.

1. Respondent recognizes that it was *all 12 counts* that caused "180 months on each count" to stack to a Life sentence (one count of conspiracy to transport child pornography, one of possession of child pornography, and ten counts of aiding the transportation of child pornography). [Response: Doc. 368 at PageID#1264.] But seven pages later, Respondent says that because Congress increased the punishment of Reedy's sole *possession* count (from 60 months to 240 months), that we be distracted away from *the other eleven counts* that made up the lion's share of his stacked sentences (that are no longer required to be stacked). *Id.* at PageID#1271. An argument over increased possession punishment is academic.

2. The Government says that on Reedy's second appeal, the Fifth Circuit inferred from silence that this Court "found no reason to depart from the guidelines and that the law was vindicated by the sentence." Doc. No. 368 at PageID#1265, citing *United States v. Reedy*, 145 F. App'x. 465, 467 (5th Cir. 2005). But where is the record statement from this Court saying that it would impose the same sentence in a *discretionary* sentencing regime?

   The Fifth Circuit actually said it better: "Thomas filed his brief prior to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005). In light of *Booker*, this error [pecuniary gain penalty found by "preponderance of the evidence" instead of "beyond a reasonable doubt" by jury], is clear and obvious. However, Thomas has not shown that the error affected his substantial rights because, although the district court may have expressed sympathy at the length of his sentence, the court

did not indicate that it would have sentenced Thomas differently under an advisory

guidelines scheme." 145 Fed. Appx. 467.

In fact, there is no mention at all of "discretionary versus mandatory" from the

second sentencing, because *Booker* came out months later.

Fortunately, the government's active confusions at bar are easily answered.

According to the Fifth Circuit, the  government cannot argue from silence on what the

district court might have done.  The Fifth Circuit has long held that the only practical

way (and it happens also to be the shortest, the easiest, the quickest, and the surest

way) to determine whether relief is warranted from a mandatory-to-discretionary

extraordinary sentencing scheme, is to ask the district judge."

"Take, for example, the way the Seventh Circuit used limited remands

after *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L. Ed. 2d 621

(2005).  Recall that in that case, the Supreme Court held that the Guidelines

are advisory rather than mandatory. *See id*. at 246. Afterwards, courts

grappled with 'the application of the plain-error doctrine to appeals from

sentences rendered under the federal sentencing guidelines' before *Booker*.

*United States v. Paladino*, 401 F.3d 471,474 (7th Cir. 2005) (Posner, J.). *Booker*

presented reviewing courts with a hard counterfactual. District courts had

imposed certain sentences thinking the Guidelines were mandatory – how

could reviewing courts know whether those district courts would have

done the same under advisory Guidelines? Judge Posner's solution to that

conundrum emphasized both efficiency and accuracy. After *Booker*, '[t]he

only practical way (and it happens also to be the shortest, the easiest, the

9

quickest, and the surest way) to determine whether the kind of plain error argued in these cases has actually occurred is to ask the district judge.' *Paladino*, 401 F.3d at 483. This approach constituted a middle ground between presuming prejudice and requiring defendants to prove the impossible. Id. at 484-85. A limited remand would allow the sentencing judge to 'dispel[] the epistemic fog' of plain-error review. Id. at 484."

*United States v. Jesus Rodriguez-Pena*, 957 F.3d 514, 519-520 (5th Cir. Apr. 27, 2020)

3. The Government tries to make hay one last time by name-calling Reedy's 60(b) motion as 're-arguing'. (Response: Doc. No. 368 at PageID#1266). They misquote the record.

This Court never treated the four grounds as re-litigating. *See*, Order denying 60(b): *Reedy v. United* States, 4:12-cv-271, Doc. No. 37. The first three grounds were denied as legitimate 60(b) issues (i.e. grounds denied based on substantive, untimely, and untimely reasons, respectively). And then the Court denied the fourth ground (i.e. fraud when the Government at bar destroyed evidence just before the 2nd 2255 was ruled upon), as something *better said* in a subsequent 2255.

## I.   There Is No Basis For Contending That Reedy's § 3582 Motion Should Be Treated Like a Habeas Petition

Congress's implementation of the compassionate release statute came shortly after it abolished the United States Parole Commission. "In the Sentencing Reform Act of 1984, Congress abolished federal parole and forbade the federal courts from 'modify[ing] a term of imprisonment once it has been imposed[.]'" *Freeman v. United States*, 546 U.S. 522,

526 (2011).   (Citing Sentencing Reform Act of 1984, Pub. L. No. 98-473, § 212(a), 98 Stat. 1837 (1998) (enacting 18 U.S.C. § 3582(c))).

Congress did, however, recognize that there may be "cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances." S. Rep. No. 98-225, at 55 (1983).  It accordingly carved out an exception for those cases that came to be known as compassionate release.  "These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment." S. Rep. No. 98-225, at 55-56 (1983).

Despite this, the Parole Commission, a three-member panel in Washington D.C. with hearing examiners in each region, argued that it should be retained to ultimately decide each defendant's release date after he or she was sentenced by a judge. See S. Rep. No. 98-225, at 52-53;  Isaac Fulwood, U.S. Dept. of Justice, U.S. Parole Comm'N, History of the Federal Parole System, at 1 (2003).  Call this job security.

Congress "strongly disagree[d] with the Parole Commission" and firmly established that "the better view is that sentencing should be within the province of the judiciary." S. Rep. No. 98-225, at 53-54.  In doing so, Congress rejected maintaining the "expensive and cumbersome Parole Commission" to determine if early release was appropriate and "provide[d] instead [via] 18 U.S.C. 3583(c) for court determination ... of the question

11

whether there is justification for reducing a term of imprisonment." *Id*. at 56. Effectively, through 18 U.S.C. 3583(c), Congress placed the sentencing judge in the shoes of the now defunct Parole Commission.

Today, compassionate release is widely understood as a means of protecting defendants from suffering harm due to unforeseen changed circumstances during their sentence. *See*, U.S. Dept. of Just., Fed. Bureau of Prisons, Program Statement 5050.50: Compassionate Release/Reduction in Sentence, at § 571.60 (2015) ("The Bureau uses 18 U.S.C. 4205(g) and 18 U.S.C. 3582(c)(1)(A) in particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing."); see also William W. Berry III, *Extraordinary and Compelling: A Re-examination of the Justifications for Compassionate Release*, 68 Md. L. Rev. 850, 860-61 (2009) (explaining that this approach "'**keeps the sentencing power in the judiciary where it belongs, yet permits later review of sentences in particularly compelling situations**'" (citing Crim. Div., U.S. Dept. of Just., *Prosecutors Handbook on Sentencing Guidelines and Other Provisions of the Sentencing Reform Act of 1984*, at 121 (1987))). (Emphasis added.)

This is more true than ever now, in light of the passage of the First Step Act of 2018, Pub L. No. 115-391, 132 Stat. 5194, and the emerging consensus among the Courts of Appeals that "district courts need not consider [U.S.S.G. § 1B1.13] when ruling on [defendant-filed compassionate release] motions." *United States v. Elias*, 984 F.3d 516, 519

(6th Cir. 2021); *United States v. Shkambi*, 2021 U.S. App. LEXIS 10053 (5ᵗʰ Cir. Apr. 7, 2021) (same).

In practice, this system works better than state and federal parole boards, because rather than being placed at the mercy of a decentralized body of arbiters, defendants are instead evaluated by the same judicial officer that has seen their case from arraignment, to trial, to sentencing:  The judge.

> "As we explained in *Shkambi*, the text of § 1B1.13 limits its applicability to 'motion[s] of the Director of the Bureau of Prisons.' No. 20-40543, at 8-9, 2021 U.S. App. LEXIS 10053 (5th Cir. Apr. 7, 2021) (quoting U.S.S.G. § 1B1.13).

> The district court therefore erred in considering itself bound by the policy statement in considering a prisoner's § 3582 motion. On remand, the district court must consider whether Hatton has demonstrated 'extraordinary and compelling reasons' justifying sentence reduction under § 3582(c)(1)(A)(i). Of course, as always, the district court also must consider the factors enumerated in § 3553(a).

> The district court's order denying Hatton's motion for compassionate release is VACATED, and the case is REMANDED for further proceedings consistent with this opinion."

*United States v. Hatton*, 2021 U.S. App. LEXIS 10036, No. 20-30494 (5ᵗʰ Cir. Apr. 7, 2021).

At bar, it is clear from the Procedural Posture section of Reedy's motion (Doc. No. 363 at pp. 7-11), that he primarily seeks relief from mandatory stacked sentences as the "crux"

of the matter.  While it is true that he inadvertently pasted a repeat-for-emphasis sentence on page 2 of his motion ("This is the crux of the matter at bar."), after mentioning his pecuniary penalty, *that* "crux" sentence was actually supposed to be pasted within the mandatory stacking "crux" mentioned in pages 7-11 (i.e. you can't have two "cruxes"). To the extent this oversight was misleading, this Reply repairs that.

II.   **Even leaving to one side the intolerable doubt surrounding the financial loss, the government's efforts to evade the mandatory stacked-to-life sentence are unhelpful and confusing** (*See*, Response: Doc. No. 368, comparing Reedy's mandatory stacked-to-Life, first-time offender sentence, to *discretionary* guidelines cases involving defendants with long criminal histories)

The Government is striving for *inconsistency* within this Court.  Respondent's own cited cases fatally distinguish their position:

For starters, take *United States v. Arojojoye*, 806 F.App'x 475 (7th Cir. 2020).  That case began in 2009, post-*Booker*, and ended in a 2011 plea agreement.  The defendant challenged his *discretionary* sentence with a change to the "50 or more victims" sentencing guidelines enhancement.  In addition, he only received 109 months.

For all that, consider *United States v. Handerhan*, 789 F.App'x 924 (3rd Cir. 2019), where the defendant also faced a discretionary sentence imposed in 2012.  But unlike the Fifth Circuit (i.e. Reedy's case jurisdiction), the Third Circuit in *Handerhan* relied on USSG §1B1.13 and the United States Sentencing Commission Policy statement, treating both as

binding on the district court (*contra* the Fifth Circuit's April 2021 case, *Shkambi* and this Court's reasoning in *Tolliver*).  What is more, Handerhan possessed *thousands* of images of child pornography, through a massive **file-sharing** program for trading this criminal content with countless others.  Handerhan received – wait for it – a 96-month sentence, and was subsequently denied compassionate release.  By contrast, the sites Thomas Reedy was convicted of aiding involved a collective total of 43 images (see Indictment attached to Doc. 363 motion).

*United States v. Fine*, 982 F.3d 1117 (8th Cir. 2020) showed that the defendant was a career offender, but would no longer be one today.  Fine received a discretionary sentence from a 2014 plea deal for 293 months, and could not be more distant from Reedy's case.

The space between *Fine* and *Reedy*, is shown by *United States v. Martinez*, 832 F.App'x 906 (5th Cir. 2021).  *Martinez* is closer to the point, yet still wrong because that defendant had such a violent criminal history.  Finally citing from the Fifth Circuit, however, Respondent probably chose the unpublished decision to show that a defendant who received a Life sentence in 1998 for drugs, money laundering, and criminal forfeiture, is somehow analogous.  Yet *Martinez* had a *lengthy* criminal history, whereas Reedy had *no* criminal history.  The government undercuts its own argument, showing instead that Reedy actually qualifies for more favorable consideration under § 3553(a)(1) (facts concerning the defendant).

*United States v. Thompson*, 984 F.3d 431 (5th Cir. Jan. 2021) is a COVID compassionate relief case. The defendant had the ability to care for himself, and had served less than half of his sentence (i.e. eight out of twenty years). By contrast, Reedy's life expectancy is likely 75 (±5 years) meaning he has served 21 out of 39 years (54%). Life expectancy figures are available. Although the Guidelines themselves provide no numerical equivalent of a life sentence, the 2006 Sourcebook of Federal Sentencing Statistics ("Sourcebook") tells us that the Sentencing Commission defines a life sentence as 470 months." *Id* (i.e. for a 30-year-old; a 37-year-old would be 386 months[2]). *See* Sourcebook, Appendix A (last visited June 19, 2007). This figure reflects the average life expectancy of federal defendants at the time of sentencing as determined by the United States Census Bureau. See 2005 Sourcebook Appendix A (last visited June 19, 2007)." [ ... ] To account for ethnicity, *see* The National Vital Statistics Reports vol. 54, No. 14 Apr. 19, 2006 at 3. Source: www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebook/2006/Figure_G.pdf

Next, we have *Brown* and *Smith*. *United States v. Brown*, 829 F. App'x 695 (5th Cir. 2020); and *United States v. Smith*, 828 F. App'x 215 (5th Cir. 2020). Both defendant's had very serious criminal histories. Once more, the Government at bar lobbies in favor of relief for Reedy based on this distinguishing § 3553(a) factor.

---

[2] Or roughly 32 years, which is remarkably just over the time Reedy asked for in his motion for sentence modification, Doc. No. 363

Reedy is not challenging his relevant pecuniary gain conduct, he is challenging his stacked and mandatory sentence. He does not need the financial data sorted out. The government concedes Reedy's sentences were imposed in a mandatory manner, and that is enough to permit the Court to decide if it will grant a sentence modification for his first-time offense, which "did not involve any direct contact with any person." (Doc. 260, text entry, AMENDED JUDGMENT.)

III.   **Granting Thomas Reedy's motion for compassionate release requires that: (a)** he either exhausted his petition or 30 days have elapsed since he submitted his request to the Warden, whichever comes first; **(b)** he has established an extraordinary or compelling reason for release (using the four *Tolliver* factors); **(c)** his release will not pose a danger to the community; and **(d)** his release is consistent with the Section 3553(a) factors.

The status of each of these is discussed below:

 **(a)**      **Exhaustion of Remedies**

The government does not contest that Mr. Reedy has exhausted his administrative remedies.

 **(b)**      **"Extraordinary and Compelling Reason(s)"**

Under *Tolliver*, the Court may find an "extraordinary or compelling reason" for release for **(1)** an "exceptionally dramatic change" in the relevant sentencing regime[3]; **(2)**

_____

[3] For example, pursuant to 28 U.S.C. § 994(0) by changing the wording of the Guidelines after judicial input from Booker.

that, today, the defendant would receive a significantly reduced sentence; **(3)** the defendant appears rehabilitated, deserving of the reduction, and likely to succeed upon release; and **(4)** strong deference to the BOP's relevant guidelines and decisions.

1) Reedy relies on the "exceptionally dramatic" sentencing regime change from stacked-to-mandatory life – a sentence this Court said was "hard" to impose and expressed sympathy for, but relented to the mandatory "Congress has made" it so standard.

2) Reedy does not presume to know the Court's mind, nor should the government assume an outcome. His sentence is vested squarely with the judge, where it belongs, yet in a remarkably different sentencing framework. *Id.*

   Court records indicate particular empathy about sentencing a first-time, non-violent offender to Life for having gradually succumbed to the invidious infection of child pornography proceeds. Effectively, through 18 U.S.C. 3583(c), Congress has now placed the sentencing judge in the shoes of the now defunct Parole Commission. The Court asked, but the Government at bar avoided an analysis in accordance with the *Tolliver/Shkambi* standard. Presumably, this is because on the merits, the totality of Mr. Reedy's 21 years of incarceration, his contrition and desire to make amends in civilized society means the judge take action in a framework where his hands are not tied.

3) The Government took no issue with Reedy's rehabilitation and length of incarceration without any disciplinary infractions (by simply not mentioning his programming records, and employment report from his UNICOR supervisor Gregory Lipe, who has worked and communicated with Reedy for over seven years).

4) Respondent neglected providing any meaningful decision on point regarding the BOP's determination of Reedy's risk of re-offending.  By contrast, Reedy submitted his First Step Act PATTERN score <u>from the BOP</u>: a "MINIMUM" risk of recidivism.  (Doc. No. 363 Exhibit.)  Deference should be given to that finding.

Reedy has arguably met the *Tolliver*/*Shkambi* standards.

    **(c)**        **Danger to the Community/Risk of Recidivism**

The government agrees that Mr. Reedy does not pose a risk of recidivism.  It failed to answer or otherwise plead the law and facts in the motion and ORDER.  See **b(3)** and **(4)** in the previous section, as well as the exhibits submitted with his motion (Doc. No. 363, Exhibits).  For completeness in assessing the government's efforts at bar, Respondent *did* choose to focus exclusively on a time in this case's history when Bill Clinton was still the sitting President, an approach which hardly meets the § 3553(a) analysis of *Pepper* and *Shkambi*.  Respondent relies on odium and stigma, over and against the occupational effort involved in performing such an analysis.

    **(d)**        **The 3553(a) Factors**

The Guidelines are only one of seven factors when the Court considers a sentence in a post-*Booker* worldview.  As the Court is well-aware, the § 3553(a) factors are as follows:  The facts concerning Thomas Reedy and his offense [(a)(1)], the purposes of sentencing

[(a)(2)], the kinds of sentences available [(a)(3)], the sentencing range "suggested" by the guidelines and the guidelines policy statements [(a)(4) & (5)], the need to avoid sentences that are unnecessarily higher or lower than those in similar cases [(a)(6)], and the need to provide restitution to any victims [(a)(7)].

The facts concerning defendant and his offense are fairly outlined above. The purposes of sentencing under the Model Penal Code (Restraint, Retribution, Rehabilitation and Deterrence) have been met already. Thomas Reedy has accepted responsibility for his actions, and after having spent over two decades in federal prison he deeply desires to make amends to society upon release; to no longer be a burden to the taxpayer; and to help others find their way post-incarceration. Granting relief at bar serves § 3553(a)(2): Anyone involved in the child pornography trade would be *deterred* by the example provided in Reedy's 21-year sentence in federal prison.

Reedy acknowledges the serious and damaging nature of his involvement in the late 1990's child pornography internet cancer; a cancer which had literally just exploded on the web. Staying out of trouble in prison for twenty-one years is not a small thing. Reedy has overcome the hardships of incarceration and has a growth mindset. If anything, he could be of use to any company seeking to ensure their services remained squarely within the bounds of the law. He, more than others who have never been incarcerated, would be uniquely qualified to know and act when it came time to bring in extra help for commercial oversight.

It is reasonable and responsible for him to request resentencing, as revealed in his motion under 18 U.S.C. § 3582(c)(1)(A)(i) (Doc. 363), or **time served**.


## CONCLUSION

Wherefore, Thomas Reedy respectfully prays for compassionate release. He has met all four factors for such a motion:

a) Reedy either exhausted his petition or 30 days have elapsed since he submitted his request to the Warden, whichever comes first (this he has done);

b) He has established an extraordinary for compelling reason for release;

c) His release will not post a danger to the community; and

d) His release is consistent with the Section 3553(a) factors.


7-6-21

/s/

_____

Date Executed                                              Thomas Reedy, *pro se*
Under penalty of perjury pursuant to                        USM # 25673-177
28 U.S.C. § 1746, I hereby swear and verify                   P.O. Box 1000
that the foregoing facts are true and correct as an affidavit;   Marion, IL  62959
Further, that it has been deposited this day in the
institution's internal mail system designed for legal mail,
United States Postal Service, first-class postage prepaid.

21

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was mailed this day via United States Postal Service, first-class postage prepaid upon the following:

<address of the AUSA>

Aisha Saleem
801 Cherry Street
Suite 1700
Forth Worth, Texas  76102

7. 6. 21

RECEIVED

JUL 1 2 2021

1:08pm

CLERK US DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

Dear Clerk of the Court,                                     7-6-21

   After writing to request a copy of the Government's
response, I received said copy on 6-28-21.
   Please file my enclosed response.
   Thank you in advance,

   Sincerely,

   Thomas Reedy, 25673-177
   U.S.P. Marion
   P.O. Box 1000
   Marion, IL. 62959



Thomas Reedy, 25673-177
United States Penitentiary
P.O. Box 1000
Marion, IL. 62959

CERTIFIED MAIL

7021 0350 0000 6940 7219

B/C      7-10-21

⇔25673-177⇔
District Court Clerk
501 W 10TH ST
FORT Worth, TX 76102-3673
United States

Special Legal Mail